FILED

2008 Feb-29  PM 02:50
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| LISA MCGEE, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-06-S-0918-NW |
| | ) | |
| STONE & WEBSTER | ) | |
| CONSTRUCTION, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER OF DISMISSAL

Plaintiff, Lisa McGee, asserts a claim for gender-based discrimination against her employer, Stone & Webster Construction, Inc., pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").[1]  The only remaining aspect of her Title VII claim concerns the allegedly discriminatory denial of incentive pay in the years 2003, 2004, and 2005.[2]  Defendant has moved for

---

[1] *See* doc. no. 19 (First Amended Complaint).  Plaintiff's First Amended Complaint also asserted a claim under the Equal Pay Act of 1963, 29 U.S.C. § 206(d), but plaintiff later agreed to the dismissal of that claim.  *See* doc. no. 36 (plaintiff's response to motion for summary judgment), at 1 ("McGee agrees to the dismissal of her Equal Pay Act claim . . . .").

[2] Plaintiff's First Amended Complaint also asserted claims based upon the rate of plaintiff's wages, and upon denial of bonus pay for the year 2006.  Plaintiff later agreed to the dismissal of those aspects of her claims.  *See* doc. no. 27 (stipulation of partial dismissal for claims of gender discrimination based on the rate of plaintiff's wages); doc. no. 32 (order dismissing all of plaintiff's claims based on gender discrimination in the rate of plaintiff's wages); doc. no. 36 (plaintiff's response to motion for summary judgment), at 1 ("McGee agrees to the dismissal of her . . . Title VII claim concerning the 2006 incentive payment.").

summary judgment on the remaining aspects of plaintiff's claim.[3]  Upon consideration of defendant's motion, the parties' briefs, and the evidentiary submission, the court concludes the motion should be granted.

## I.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[4]  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

> The mere existence of some factual dispute will not defeat

---

[3]Doc. no. 28.

[4] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal quotations and citation omitted) (bracketed text suppled).

## II. SUMMARY OF FACTS

### A.    Stone & Webster's TVA Contract

Defendant, Stone & Webster Construction, Inc. ("Stone & Webster" or "defendant") has a contract to perform "Modification and Supplemental Maintenance Services" ("MODS") at the following three nuclear power plants operated by the Tennessee Valley Authority ("TVA"): *i.e.,* Browns Ferry Nuclear near Athens, Alabama ("Browns Ferry"); Watts Bar Nuclear in Spring City, Tennessee ("Watts Bar"); and Sequoyah Nuclear in Soddy-Daisy, Tennessee ("Sequoyah").[5]    TVA monitors Stone & Webster's performance under the MODS contract by posting a full-time Technical Contract Manager at each plant site. The Technical Contract Manager is an employee of TVA, not Stone & Webster, but Stone & Webster is required to go through the Technical Contract Manager to gain TVA's approval before appointing

---

[5]Defendant's evidentiary submission, Tab D (Deposition of Donald Olson), at 16; Tab M, at Exhibit 23; Tab O (Technical and Management Proposal for Modification and Supplemental Maintenance Services for TVA Nuclear).

personnel to ceratin job positions under the MODS contract.  At all times relevant to plaintiff's claims, Jeff Nauditt served as the TVA Technical Contracts Manager at Browns Ferry.[6]

Stone & Webster routinely hires hundreds of temporary employees to work during so-called "outages": *i.e.,* periods during which the plant is nonoperational and repairs can be made.  Stone & Webster also maintains a "core staff" of three to five employees who work year-round at each plant, and who are responsible for planning outages, and mobilizing and supervising the temporary outage employees.[7]  The core group of employees is paid under the TVA contract even when there are no temporary employees working on an outage.[8]

## B.    The Early Years of Plaintiff's Employment with Stone & Webster

Plaintiff, Lisa McGee, first worked for Stone & Webster on a temporary basis during outages in the years 2000 and 2001.  She worked approximately ninety days in both of those years as an "office aide," assisting with timekeeping and data entry.[9] Before she performed these temporary jobs, plaintiff had no training or experience in

---

[6]Defendant's evidentiary submission, Tab C (Deposition of Kent Ryan), at 28, 34-35; Tab D (Deposition of Donald Olson), at 146; Tab E (Deposition of Jeffrey Nauditt), at 4-5; Tab A (Deposition of Lisa McGee), at 33.

[7]Olson Deposition, at 69, 148; defendant's evidentiary submission, Tab J (Deposition of Serge Cormier), at 15; Tab M, Exhibit 23, at C-1.

[8]Defendant's evidentiary submission, Tab A (Deposition of Lisa McGee), at 190-91; Tab E (Deposition of Jeffery Nauditt), at 17.

[9]McGee Deposition, at 15-17.

any engineering, nuclear, or other construction industry.[10]  Stone & Webster hired plaintiff to work in a full-time, year-round position as an "Administrator" at the Browns Ferry nuclear facility in October of 2001.  In that position, plaintiff performed timekeeping duties, such as collecting employee time cards and delivering them to the accounting department, providing employee rosters when requested, and other administrative tasks assigned by her supervisor.[11]  She was paid at a rate of $17.50 per hour.[12]

## C.   The Unit 1 Restart Project and Resulting Staff Changes

Don Olson served as Stone & Webster's "Project Director" over the TVA MODS contract from 1998 to 2002.  In that position, Olson was responsible for the performance of the contract at all three nuclear plant sites, and he directly supervised the three Site Managers who were in charge at each plant site.[13]  In May of 2002, TVA initiated the Unit 1 Restart Project ("Unit 1") — a five-year effort to restore Browns Ferry's first nuclear power unit, which had been non-operational for over twenty-five years.[14]  Stone & Webster received the contract for Unit 1 in

---

[10]McGee Deposition, at 184-85; defendant's evidentiary submission, Tab N (resume of Lisa McGee).

[11]McGee Deposition, at 18-19; 28-31.

[12]*Id.* at 32.

[13]Olson Deposition, at 33-34; defendant's evidentiary submission, Tab M, Exhibit 23, at C-1; defendant's evidentiary submission, Tab O, at 3-4.

[14]Defendant's evidentiary submission, Tab C (Deposition of Kent Ryan), at 26-27.

approximately May of 2002, and Don Olson became the "Site Director" for Unit 1. Kent Ryan took over Olson's position as Project Director over the three MODS projects at Browns Ferry, Watts Bar, and Sequoyah.  At that time, Earl Williams became the Site Manager over the MODS contract at Browns Ferry.[15]

In June of 2002, Norm Ruhl was assigned to Unit 1 as Human Resources Manager, tasked with the responsibility to develop and staff a Human Resources Department for the site.[16]  Ruhl had 22 years of supervisory experience in the engineering and construction industry, and he had worked with Stone & Webster for approximately 18 years.[17]  Before that assignment, Ruhl had served as the Technical Manager/Site Administrator at Browns Ferry.  In that position, Ruhl performed the following duties:  handling all Human Resources issues for non-manual personnel at the site, including processing paperwork for hires and terminations, processing payroll and benefits, implementing company policies, and processing EEO and affirmative action reports; investigating and reporting employee concerns; submitting Cost Work Authorizations ("CWA's") to TVA to authorize spending for certain items of work or for subcontractors; processing reports to summarize the number of

---

[15]Olson Deposition, at 41-42; Ryan Deposition, at 28-30; defendant's evidentiary submission, Tab L (Deposition of Earl Williams), at 18-20.

[16]Defendant's evidentiary submission, Tab G (Deposition of Norm Ruhl), at 11-12; Ryan Deposition, at 27.

[17]Defendant's evidentiary submission, Tab O, at 8-11 (Resume of Norm Ruhl).

workers on site; reporting any performance issues he noticed to the Site Manager; and helping the Site Manager implement a staffing plan.[18]  Ruhl also played some role in supervising the mobilization of temporary employees during an outage, but the record does not clearly reflect the extent of that role.  At some point, Ruhl hired an employee named Christy Tucker to handle mobilization, but the record does not clearly reflect whether Tucker took over those duties before or after Ruhl transferred to Unit 1.[19]  The Technical Manager/Site Administrator position traditionally had been occupied by someone with construction and engineering experience who could serve as second-in-command to the Site Manager if necessary.[20]  It is undisputed that Ruhl possessed construction and engineering experience, but it also is undisputed that his duties as Technical Manager/Site Administrator never required him to actually serve as second-in-command.[21]

When Ruhl transferred to Unit 1, he continued to perform the human resources and employee concerns functions he had been performing at Browns Ferry, in addition to taking over new duties related to the Unit 1 project.[22]  Thus, after Ruhl's

---

[18]Ruhl Deposition, at 24-32, 48-52, 66-73, 79, 87-89

[19]Ruhl Deposition, at 23-24, 80-81; McGee Deposition, at 152.  Plaintiff testified that Tucker was hired sometime "shortly after" she was, but could not recall the exact time frame.  McGee Deposition, at 152.  Ruhl testified that he could not remember when he hired Tucker.  Ruhl Deposition, at 80.

[20]Olson Deposition, at 67-70; Ryan Deposition, at 174.

[21]Olson Deposition, at 153; Ruhl Deposition, at 85-86.

[22]Ruhl Deposition, at 11-12.

transfer to Unit 1, the Browns Ferry Technical Manager/Site Administrator position required the performance of different duties.  For example, Jeff Nauditt, the TVA Technical Contracts Manager at Browns Ferry, testified that employee concerns had comprised about 30% of Ruhl's duties as Technical Manager/Site Administrator.[23] A Justification for Salary Increase form submitted to defendant's corporate human resources department stated that, in the future, the Unit 1 project would provide approximately 50% of the services that previously had been provided by the Project Administrator at Browns Ferry.[24]   The change in duties was implemented solely because Stone & Webster management thought that the human resources and employee concerns functions could more efficiently be performed in Unit 1 than internally at Browns Ferry.  Thus, the Site Administrator at Browns Ferry would have performed different job duties after the start of the Unit 1 project, regardless of who was occupying the position at the time.[25]

Jeff Nauditt recommended plaintiff to replace Ruhl after Ruhl transferred to Unit 1, and he requested that she receive a pay rate of $30.00 an hour — a 71%

---

[23]Nauditt Deposition, at 15.

[24]Defendant's evidentiary submission, Tab M, at Exhibit 13.  Kent Ryan testified that Norm Ruhl prepared the form, and he forwarded it to the corporate human resources department.  Ryan Deposition, at 53-58.

[25]Olson Deposition, at 139, 143.

increase over her previous rate.[26]  Stone & Webster accepted that recommendation, and plaintiff received the position effective August 26, 2002.[27]  Because such a significant pay increase was proposed, Norm Ruhl prepared a Justification for Salary Increase form, and Kent Ryan forwarded it to Stone & Webster's corporate human resources department.  The form stated that the reason for the substantial increase in plaintiff's rate of pay was "promotion and new job assignment from administrator to senior administrator."[28]  A memo that accompanied the form more fully explained the reasons for the raise as follows:

> Our Contract with TVA for Maintenance and Modification for operating units provides for a core group position of Project Administrator.  This position is currently filled by Norm Ruhl.  In addition, to support the Project we have maintained an Administrative/Timekeeper/Mobilization position that performs numerous tasks in support of the Project.  This position has been filled for the past year by Lisa McGee.

> With the addition of the large Unit 1 Restart Project at Browns Ferry, organizational changes are being made such that certain Unit 1 Project functions, such as Accounting, Safety, Human Resources, and Contracts will support both the Unit 1 and Operating Unit Projects.  Other functions will remain dedicated to their respective project due to funding and performance considerations.

> With these changes, Norm Ruhl will leave the Operating Units Project Administrator position and be reassigned to fill the Site Human

---

[26]Nuditt Deposition, at 7-8; Ryan Deposition, at 27, 30-31; McGee Deposition, at 34.

[27]Defendant's evidentiary submission, Tab M, at Exhibit 13.

[28]*Id.* at 1.

Resource position.  Approximately 50% of the current duties of the Operating Units Project Administrator position will be provided in the future by the Unit 1 Project.

The TVA Modifications manager, who is also the Technical Contracts manager, Mr. Jeff Nauditt, has recommended that for the Operating Units that, due to a reduced workscope of the Project Administrator position, we combine the duties of the Project Administrator position and the Administrative/ Timekeeping/ Mobilization position.  During outage periods, additional temporary administrative resources would be hired.  Mr. Nauditt recommended that this new Project Administrator position should be at a starting salary of $30.00 per hour, which is fully reimbursable by TVA.

To fill this position, S & W Site Manager Earl Williams, [sic] has selected Lisa McGee to be promoted to this position.  In addition, Jeff Nauditt has strongly recommended that Lisa fill this new position.  Their decisions have been based on evaluation of her performance to the [Browns Ferry] Modification Organization during the past year, her interactions with both TVA and S & W Personnel, and review of her extensive work experience prior to joining Stone and Webster.[29]

The increase was approved, and plaintiff's **corporate** job classification was changed from Administrator to Senior Administrator.  Most Stone & Webster employees did not regularly use the term "Senior Administrator," however.  At the Browns Ferry **worksite**, plaintiff was known as either the "Site Administrator," "Project Technical," or "Project Administrator."[30]  Plaintiff testified that, after she was promoted, someone

---

[29]*Id.* at 2-3.

[30]Olson Deposition, at 67-68, 192-93, 199; McGee Deposition, at 101-02; Nauditt Deposition, at 14; Lefferts Deposition, at 75; Ruhl Deposition, at 5-6; Kappes Deposition, at 38; Williams Deposition, at 15, 44-45. *See also* defendant's evidentiary submission, Tab M, Exhibit 17, at 3; Exhibit 18, at 2; Exhibit 19, at 3; Exhibit 20; Exhibit 21; Exhibit 27; Exhibit 35; Exhibit 40; Exhibit 43, at 2; Exhibit 45; Exhibit 46; Exhibit 51.

else was hired to perform her former duties as Administrator.[31]

When Jeff Nauditt first discussed the new position with plaintiff, he showed her a list of duties that Norm Ruhl had performed in the job.  Plaintiff testified that she did not perform several of the duties on the list, including:  producing monthly Employee Concerns and EEOC reports; handling human resources and benefits; maintaining contracts for subcontractors; initiating contract deviation letters; and initiating field purchase requisition letters.[32]  Plaintiff also testified that she performed only parts of the functions associated with mobilization of employees.[33]  During plaintiff's conversation with Nauditt, he told her that she would be eligible for the same benefits and bonuses that Norm Ruhl had received as Site Administrator, and that, within two years, she would be earning the same salary that Ruhl had earned.[34]  (Nauditt denied making these statements, however, and testified that he played no role in Stone & Webster's decisions about awarding bonuses.  He also does not know

---

[31]McGee Deposition, at 45, 231-32.

[32]McGee Deposition, at 38-50; Exhibit 1.  The list also included the following duties: preparing weekly headcount reports; generating quarterly reports to create fee letters; handling mobilization of employees; maintaining databases for cost and human resources utilized by management and supervisors; creating and maintaining reports and spreadsheets for outage and preoutage staffing to update TVA; creating Client Work Authorization forms; assisting management with contract and other issues, as required; and resolving payroll issues for craft and non-manual personnel.  *Id.*

[33]McGee Deposition, at 43, 49.

[34]McGee Deposition, at 54-55.

how much Ruhl was paid, or whether Ruhl received a bonus.[35]).

**D.     The Incentive Compensation Plan**

In 2001, Don Olson proposed the development of an incentive compensation

plan for certain Stone & Webster employees working at TVA operating units.[36] Stone

& Webster created a written description of the incentive compensation plan, which

stated that the plan's objective was "to create a system of risks and rewards that are

aligned with TVA's performance objectives."[37]   The intent of the plan was to

"maximize [Stone & Webster's] fee revenue by directly linking the compensation of

key individuals at each site to these performance objectives."[38] The plan was to be

funded from Stone & Webster's gross profits, but only if the gross profit margin

exceeded a certain percentage.   The original document describing the plan

categorized the following positions as "key positions":  Director Operating Units, Site

Manager, Lead Electrical, Lead Mechanical, Lead Civil, Lead Field Engineer, Project

Technical, Site Safety, Cost & Scheduling, Accounting, and HR.[39]   Kent Ryan

testified, however, that the number of "key positions" participating in the plan could

change from year to year.  According to Ryan, the incentive program was designed

---

[35]Nauditt Deposition, at 9, 16.

[36]Olson Deposition, 78-79.

[37]Defendant's evidentiary submission, Tab M, at Exhibit 1.

[38]*Id.*

[39]*Id.*

to reward the individuals that "made our job happen, that made our job meet its goals, made our company met its financial goals, and that were [sic] the people that could affect the project to make it successful."[40]

At the beginning of each year, Stone & Webster identified the key personnel at each site who "made the difference and would take that project across the finish line at the end of the fiscal year."[41]  Once those individuals were identified, they knew they were participants in the incentive program, and they knew what project goals would have to be met in order for the incentive payouts to be made.[42]  The goals were team-based, for the project as a whole, but if one individual did not do his or her "fair share" to contribute to the goal, he or she could be eliminated from consideration under the incentive program.[43]

TVA "had nothing to do with" the incentive plan.[44]  Instead, the Project Director, sometimes with input from the Site Manager at each plant, generally determined the individuals who would be eligible to participate in the incentive plan.[45]  Even after Ryan took over as Project Director, however, he had to submit his

---

[40]Ryan Deposition, at 137-38.

[41]*Id.* at 138.

[42]*Id.* at 242.

[43]*Id.* at 242-43.

[44]Olson Deposition, at 79.

[45]Ryan Deposition, at 148.

recommendations to Don Olson for approval.[46]

In 2003, Kent Ryan evaluated plaintiff's eligibility to participate in the incentive program under the category "Project Technical." He conferred with Don Olson and concluded that plaintiff would not be eligible, because she was too new to her position.[47] Ryan prepared two versions of a list of all employees at the Browns Ferry, Sequoyah, and Watts Bar plants who were eligible to participate in the 2003 incentive program. On the first version, for plaintiff's position, the list stated, "Project Technical - Lisa McGee beginning 2004."[48] On the second — and final — version, the list stated, for plaintiff's position, "Project Technical – Lisa McGee – New to position – Future consideration."[49]

In 2004, Ryan again determined that plaintiff's job did not have a sufficient impact upon Stone & Webster's ability to meet its safety, quality, financial, scheduling, and customer satisfaction goals to justify including her in the incentive program.[50]

In 2005, Don Olson returned to the position of Project Director over the MODS

---

[46]Olson Deposition, 241; Ryan Deposition, at 107-08.

[47]Ryan Deposition, at 128-34, 185.

[48]Defendant's evidentiary submission, Tab M, at Exhibit 45. *See* also Ryan Deposition, at 128-34.

[49]*Id.*

[50]Ryan Deposition, at 145-46.

contract.  The Site Manager at Browns Ferry in 2005 was Joe Kappes, who had worked at Stone & Webster only since December 2004.[51]  After coming on board as Site Manager, Kappes learned of the incentive program and asked Don Olson what he needed to do about it.  Olson gave Kappes a list of individuals who were eligible to receive bonuses and asked Kappes if he agreed with the list.[52]  Plaintiff's name was not on the list, and Olson did not tell Kappes plaintiff could be considered eligible.[53]  Kappes did not object to the names Olson had chosen.  In fact, he testified that he would have agreed to anything Olson suggested at that time.[54]  Olson testified that plaintiff did not receive an incentive payment in 2005 because she was not among the "key personnel."  In Olson's opinion, the most important consideration in determining whether an employee in the Site Administrator position should be considered a "key employee" is whether the employee possessed sufficient technical experience to serve as second-in-command to the Site Manager and fill that role in the Site Manager's absence.[55]

---

[51]Defendant's evidentiary submission, Tab K (Deposition of Joseph Kappes), at 6, 9.

[52]Kappes Deposition, at 10, 40.

[53]Olson Deposition, at 168.

[54]Kappes Deposition, at 10, 40-41.  Kappes' true opinion about whether plaintiff deserved a bonus is difficult to discern from the record.  During his deposition, Kappes testified that plaintiff's position was not one that typically would be rewarded with a bonus in the construction industry, because she did not "generate revenue for the company."  Kappes Deposition, at 14-15.  Later, however, he testified that, if it were up to him, he would give plaintiff a bonus because she "excels in her job performance."  *Id.* at 30-31.

[55]Olson Deposition, at 150-52.

In March of 2006, plaintiff learned that Kappes had received a bonus for 2005. That prompted her to investigate, and she soon learned that other employees at Browns Ferry had received bonuses not only for 2005, but for the preceding two years as well.[56]  Plaintiff previously had believed that no one had received bonuses in 2003, 2004, and 2005, because the outages during those years had not been profitable.  She testified that her belief that bonus pay was tied to outage profitability was based upon her interpretations of casual conversations she overheard at work.[57]

## E.    Plaintiff's Alleged Comparators

Plaintiff has pointed to other employees whose bonus compensation she feels is relevant to her claims.  She considers the following male employees at other plants to be her "counterparts," either because they also serve as Site Administrator at their respective job sites, or because they perform "common" job duties:  Serge Cormier at Watts Barr, and Ken Luper at Sequoyah.[58]  She estimates that she spends 70-75% of her time performing job duties that these men also perform, including preparing and tracking Client Work Authorizations, providing estimates to TVA, submitting labor requisitions to the union halls, and head count reporting.[59]  Both of these alleged

---

[56]McGee Deposition, at 74-76.

[57]McGee Deposition, at 116.

[58]McGee Deposition, at 211, 216-17.

[59]*Id.* at 217.

comparators also testified as to his job responsibilities.

At the time of his deposition in April of 2007, Serge Cormier had worked for Stone & Webster for thirty-four years.[60]  He had served as the Site Administrator at Watts Bar for eleven years.[61]  During an outage, Cormier serves as the acting Site Manager during the night shift, managing all the labor superintendents and working in the field to ensure the craft workers perform their jobs properly.  All administrative duties fall to Cormier's assistant during outages.[62]  After an outage, Cormier is responsible for assessing the cost of the outage and discussing the charges with TVA.[63]  Cormier also is responsible for preparing work cost estimates and managing project scheduling, tasks that require a daily scheduling meeting with TVA.[64]  He handles all employee concerns issues at Watts Bar by investigating any complaints and reporting them to TVA.[65]  He also is responsible for mobilization of craft employees, and he handles the hiring and layoff aspects of human resources for Watts Bar.[66]

Ken Luper served as the Site Administrator at Sequoyah from June of 1995

---

[60]Cormier Deposition, at 5.

[61]*Id.* at 5-7.

[62]*Id.* at 8-10.

[63]*Id.* at 11, 31.

[64]*Id.* at 11-17.

[65]*Id.* at 18-19.

[66]*Id.* at 19, 21.

until April of 2004, when he was promoted to Site Manager.  He worked as Site

Manager until October of 2005.  He then returned to his former position as Site

Administrator until January of 2006, when he transferred to a position with Stone &

Webster's corporate office in Baton Rouge, Louisiana.[67]  When he served as Site

Administrator, Luper was responsible for scheduling employee training, performing

cost analyses and interfacing with TVA on all financial issues, serving as acting Site

Manager when required, interfacing with the union, resolving union grievances,

handling employee concerns, managing subcontracts, resolving disputed charges with

TVA, hiring and recruiting non-manual personnel, terminating any craft or non-

manual personnel, scheduling outage milestones, managing payroll, and processing

the temporary employees hired for outages.[68]  Luper testified that cost analysis took

up more of his time than any other single duty.  He estimated that he spent

approximately 30% of his time on cost analysis, about 15% to 20% on payroll, about

10% on hiring and recruiting, and about 10% on processing new temporary

employees.[69]  None of Luper's responsibilities ever were managed or shared by Unit

1.[70]  Luper holds a Bachelor's degree in Construction Technology, and at the time of

---

[67]Defendant's evidentiary submission, Tab I (Deposition of Kenneth Luper), at 7-8.

[68]*Id.* at 20-24.

[69]Luper Deposition, at 39-41, 59-61.

[70]*Id.* at 26-27.

his deposition in April of 2007, he had more than 25 years of experience in the nuclear and construction industries.[71]

Additionally, Libby Bell, a female employee, held the position of Site Administrator at Sequoyah from July of 2004 until March of 2005, when she transferred to Stone & Webster's central office for all TVA plants to perform Project Cost functions. In 2005, Bell was included in the incentive compensation plan.[72]

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 11, 2006.[73]  She alleged discrimination on the basis of sex, beginning in August of 2002, and continuing through the date of filing.  With regard to bonus pay, plaintiff made the following statements in her EEOC charge:

> Since approximately August 2002, I have worked as a site administrator on the operating units (2 and 3).  In March 2006 I learned that male members of the core management group of which I was a part had received bonuses in December 2005.  At that time, I also learned that male members of the core management group had been receiving bonuses since I became site administrator.  Though I was told I would receive bonuses as a site administrator when I got the job, I did not receive bonuses in 2002, 2003, 2004, or 2005, and I assumed no one else did either.  I learned in March 2006 that I assumed incorrectly.  I

---

[71]*Id.* at 7-8; defendant's evidentiary submission, Tab O, at 12-15 (resume for Kenneth E. Luper).

[72]Defendant's evidentiary submission, Tab M, at Exhibit 4; Tab H (Deposition of Libby Bell), at 42.

[73]*See* Exhibit 1 to plaintiff's First Amended Complaint (doc. no. 19).

believe I was denied bonuses because of my gender.[74]

The EEOC issued plaintiff a notice of her right to sue on February 22, 2007, and plaintiff moved to amend her complaint to add a claim pursuant to Title VII on February 27, 2007.[75]

## III.  DISCUSSION

### A.   Timeliness of Plaintiff's Claims for Denial of Incentive Pay in 2003 and 2004.

Defendant argues that plaintiff's claims for denial of incentive pay in the years 2003 and 2004 are time-barred because she did not file her EEOC charge within 180 days of the denials.  It is true that an aggrieved employee must submit a charge of discrimination to the EEOC within 180 days "after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); *see also, e.g., Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000) ("No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge."); *Stafford v. Muscogee County Board of Education*, 688 F.2d 1383, 1387 (11th Cir. 1982) ("In order to assert a claim of racial discrimination under Title VII, a claimant must file a complaint with the EEOC within 180 days after the alleged discriminatory practice occurred.").  "An individual

---

[74]*Id.*

[75]Doc. no. 17.  *See also* order entered on March 7, 2007, granting plaintiff leave to amend her complaint.

must file a charge within the statutory time period and serve notice upon the person against whom the charge is made." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). Failure to do so renders the claim time-barred. *See, e.g.*, *Delaware State College v. Ricks*, 449 U.S. 250, 256 (1980); *Everett v. Cobb County School District*, 138 F.3d 1407, 1410 (11th Cir. 1998); *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 796-97 (11th Cir. 1992).

Here, plaintiff did not file her EEOC charge until May 11, 2006. Therefore, any allegedly discriminatory acts occurring more than 180 days before May 11, 2006 — including the alleged denials of incentive payments in 2003 and 2004 — ordinarily would be time-barred. Plaintiff nonetheless argues that the 180-day filing period should be equitably tolled because she did not become aware that other, male employees had received incentive payments until March of 2006.[76]

Under the Eleventh Circuit's equitable tolling doctrine, "Title VII's statute of limitations period does not start to run until a plaintiff knew or reasonably should have known that she was discriminated against." *Carter v. West Publishing Co.,* 225 F.3d 1258, 1265 (11th Cir. 2000) (citing *Ross v. Buckeye Cellulose Corp.,* 980 F.2d

---

[76]Plaintiff does not advocate, as defendant suggests, that the decision of the United States Supreme Court in *Ledbetter v. Goodyear Tire & Rubber Co.,* — U.S. — , 127 S. Ct. 2162 (2007), announced a "discovery rule." To the contrary, plaintiff acknowledges that the *Ledbetter* decision "did not address whether and when the 180-day limitations period may be subject to a discovery rule.'" Doc. no. 36 (plaintiff's brief in opposition to summary judgment), at 17 (citing *Ledbetter,* 127 S. Ct. at 2177 n.10).

648, 661 n.19 (11th Cir. 1993)).  Stated slightly differently, under equitable tolling,

"a limitations period does not start to run until the facts which would support a charge

of discrimination are apparent or should be apparent to a person with a reasonably

prudent regard for his rights."  *Sturniolo v. Sheaffer, Eaton, Inc.,* 15 F.3d 1023, 1025

(11th Cir. 1994) (citations omitted).  As the party asserting the applicability of the

equitable tolling doctrine, plaintiff "bears the burden of proving that it is

appropriate."  *Carter,* 225 F.3d at 1265 (citing *Ross,* 980 F.2d at 661).[77]

The Eleventh Circuit has applied equitable tolling to excuse a late EEOC filing

when a plaintiff knew about the adverse job action she experienced long before she

filed her EEOC charge, but did not have enough information to determine that the

adverse might be discriminatory until much later.  In *Sturniolo v. Sheaffer, Eaton,*

*Inc.,* 15 F.3d 1023 (11th Cir. 1994), the plaintiff's employment was terminated in

October of 1990.  *Id.* at 1025.  His employer informed him that

> (1) the termination was part of a plan to save financial resources by
> reducing the number of selling regions from four to three nationwide;
> (2) the sales area known as the Southeast region was being absorbed into
> the Northeast region to create one "Eastern" region; and (3) the position

---

[77]It is not necessary, as defendant argues, for plaintiff to show that it misled her, or that her late filing was the result of an "inequitable event."  *See* doc. no. 38 (defendant's reply brief, at 4-5).  None of the cases cited by defendant to support this argument arose in the employment discrimination context, and none involved the filing of charges of discrimination with the EEOC.  *See Sandvik v. United States,* 177 F.3d 1269, 1271 (11th Cir. 1999) (motion to vacate, correct, or set aside sentence pursuant to 28 U.S.C. § 2255); *Penoyer v. Briggs,* 206 Fed. Appx. 962, 965 (11th Cir. 2006) (suit by a prisoner under 42 U.S.C. § 1983).

of Southeast region sales manager was being eliminated.

*Id.*  The plaintiff believed the reasons offered by his employer until early in 1991, several months after his discharge, when he learned that a younger individual had been hired to replace him.  *Id.* at 1025-26.  The Eleventh Circuit decided that the plaintiff did not have sufficient information to support a charge of discrimination based on age until "the date [the plaintiff] knew or should have known that [his employer] had hired a younger individual to replace him," and held that the tolling period should commence on that date.  *Id.* at 1026.  *See also Jones v. Dillard's, Inc.,* 331 F.3d 1259 (11th Cir. 2003) (applying equitable tolling when employee initially believed she was discharged for legitimate business reasons, but later filed an age-based charge of discrimination within 180 days of learning that she had been replaced by a younger individual).[78]  *Compare Turlington v. Atlanta Gas Light Co.,* 135 F.3d

---

[78]The Eleventh Circuit emphasized in *Jones* that, if equitable tolling could not be applied in cases where an employee does not learn of facts sufficient to support a discriminatory motive behind an employment decision within 180 days of that decision, then employers could manipulate the circumstances to avoid liability for discrimination.

> The malicious employer can attempt to circumvent ADEA liability by timing its discriminatory acts.  Firing an employee for "financial" reasons, concealing the true motivation (i.e., age), and then replacing that employee with someone outside of the protected class six months later is all that may be necessary to discriminate illegally, yet escape liability.  If the employee acts on a mere suspicion, he has acted prematurely; the employee's claim will likely fail because the truly damning evidence has not yet emerged — and will not emerge given the defendant's revelation of the suit.  If, on the other hand, the employee lies in wait for the surfacing of telltale evidence, i.e., the hiring of a younger employee, the cunning employer will escape liability by postponing the hiring of a replacement for at least six months.  Thus, an employee thrust into this situation faces two equally unattractive options . . . .

1428, 1435-36 (11th Cir. 1998) (filing deadline could not be equitably tolled when the plaintiff had retained counsel and "protested vigorously against his failure to receive the same training opportunities offered to his younger co-workers" before the filing period expired).

Here, plaintiff did not learn until March of 2006 that other, male employees had received incentive payments. Despite the fact that Jeff Nauditt had told plaintiff that she would receive the same incentive payment as Norm Ruhl, plaintiff believed the payments were not made for the years 2003-05 because the outages during those years had not been profitable. The court concludes, construing the evidence in the light most favorable to plaintiff, that her belief was reasonable. Consequently, plaintiff did not possess sufficient information to support a claim of gender-based discrimination until she learned, in March of 2006, that other, male employees had received incentive payments in 2003 and 2004, despite those years' allegedly poor outage performances. Because plaintiff filed her EEOC charge within 180 days of learning sufficient facts to support defendant's alleged discrimination, equitable tolling applies, and plaintiff's Title VII claims for the years 2003 and 2004 are not time-barred.

**B.    Claims for Denial of Incentive Payments in 2003, 2004, and 2005**

---

*Jones,* 331 F.3d at 1264.

Plaintiff acknowledges that she does not possess direct evidence to support her claim for gender-based discrimination based upon denial of incentive payments in 2003, 2004, and 2005.[79]  She must therefore prove her claim with circumstantial evidence, navigating the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981).  Under this analysis, a plaintiff must first establish a *prima facie* case of disparate treatment, which creates a presumption of discrimination.  To rebut the presumption, the employer then must articulate a legitimate, nondiscriminatory reason for the disputed employment action.  If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that defendant's proffered reason is merely a pretext for unlawful discrimination.  *See McDonnell Douglas,* 411 U.S. at 802-05; *Burdine,* 450 U.S. at 252-56.

### 1.   Plaintiff's *Prima Facie* Case

A female employee establishes a *prima facie* case of gender-based wage discrimination under Title VII "by showing that she occupies a job similar to that of higher paid males."  *Meeks v. Computer Associates Intern.,* 15 F.3d 1013, 1019 (11th Cir. 1994) (citing *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1528

---

[79]*See* doc. no. 36 (plaintiff's brief), at 18.  ("In most cases, of course, *as here,* there is no direct evidence . . . .") (emphasis supplied).

(11th Cir. 1992)).  Undisputedly, plaintiff is female, and she did not receive incentive payments during the years 2003-2005, while other, male employees did receive such payments.  The remaining question is whether the male employees who *did* receive incentive payments performed jobs "similar to" plaintiff's.

Title VII requires a "more relaxed standard of similarity between male and female-occupied jobs" than that required by the Equal Pay Act.  *Miranda,* 975 F.2d at 1529 n. 15.  A Title VII plaintiff "is not required to meet the exacting standard of substantial equality of positions set forth in the Equal Pay Act."  *Id.*  Instead, the plaintiff must show that she performed the same "type of duties" or the "same type of tasks" as higher-paid male employees.  *Id.* at 1529.[80]

Plaintiff identifies Serge Cormier and Ken Luper — the Site Administrators at Watts Bar and Sequoyah, respectively — as male employees who performed jobs that were similar to hers.  She also identifies her predecessor, Norm Ruhl, but not in his current position as Human Resources Manager at Unit 1.  Instead, she argues that

---

[80]Plaintiff argues for a different formulation of the *prima facie* case "to take into account that under the bonus plan at issue eligibility was determined by position held and not by alignment of job duties between nuclear sites."  Doc. no. 36 (plaintiff's brief), at 20.  She would have the court infer discrimination because "1) the incentive plan makes the site administrator/project technical **position** eligible for incentive payment, 2) McGee held the site administrator project technical **position** at the Brown's Ferry operating units, and 3) men holding eligible **positions** received incentive payments while McGee, a woman, did not."  *Id.* at 22 (emphasis in original).  Plaintiff has cited to no case in which a court employed such an analysis to evaluate allegations of gender-based discrimination based upon failure to pay bonuses.  Absent any authority to support plaintiff's position, the court will not deviate from the Eleventh Circuit's mandate to consider employee's comparative job *duties*, not their job *titles*.  *See Miranda,* 975 F. 2d at 1529.

Norm Ruhl's duties were similar to her own *when he served as Site Administrator at Brown's Ferry.* Construing the evidence presented in the light most favorable to plaintiff, plaintiff spends 70-75% of her time performing job tasks that her male comparators also perform. Thus, while plaintiff's job duties are not *identical* to those of her comparators, the court concludes her job duties are sufficiently similar to support a *prima facie* case of gender-based discrimination.

### 2.    Legitimate, Non-Discriminatory Reasons[81]

As plaintiff has established a *prima facie* case of gender-based wage discrimination, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for granting incentive awards to male employees, but not to plaintiff, in the years 2003-2005. Defendant states that plaintiff did not receive the incentive awards because of "critical differences" between plaintiff and her comparators "in experience and technical duties performed."[82] More specifically, Kent Ryan testified that plaintiff did not receive an incentive award in 2003 because she was too new to her position to affect project profitability. Ryan also testified that plaintiff did not receive an award in 2004 because she did not have a sufficient impact

---

[81]Defendant has not — as plaintiff suggests — waived its right to offer legitimate, non-discriminatory reasons for its employment decisions, or to demonstrate that plaintiff has no evidence of pretext. *See* doc. no. 36 (plaintiff's brief), at 26. To the contrary, defendant has adequately argued both points in its briefs.

[82]Doc. no. 38 (defendant's reply brief), at 6.

upon Stone & Webster's ability to meet its safety, quality, financial, scheduling and customer satisfaction goals.  Don Olson testified that he did not select plaintiff to receive an incentive award in 2005 because she was not considered to be among the "key personnel."  He did not characterize her as "key personnel" primarily because she did not possess sufficient technical experience to serve as second-in-command to the Site Manager, or to fill the Site Manager's position in his absence.

### 3.    Pretext

As defendant has proffered legitimate, non-discriminatory reasons for its decision not to grant plaintiff incentive awards in 2003, 2004, and 2005, plaintiff can survive summary judgment on her Title VII gender discrimination claim only if she comes "forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas,* 411 U.S. at 804).  Plaintiff's burden at this step of the analysis is that of "cast[ing] sufficient doubt on the defendants' proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct . . . .'"  *Combs*, 106 F.3d at 1538 (quoting *Cooper-*

-28-

*Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)); *see also*

*Chapman*, 229 F.3d at 1024-25.  Plaintiff shoulders that burden by demonstrating

"such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions

in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting

*Sheridan v. E.I. DuPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir.

1996)) (internal quotation marks omitted).

Plaintiff first contends that defendant's proffered legitimate, non-

discriminatory reasons are pretextual because the incentive payment decisions were

based upon unannounced, subjective criteria, including the requirement that an

employee's position affect profitability, and the requirement that an employee be able

to serve as second-in-command to the Site Manager.  First, the record does not

support the assertion that the profitability requirement was "unannounced."  The

incentive plan documents clearly state that the program was designed to reward

employees who help Stone & Webster reach its profit goals.  On the other hand, there

is no evidence that the second-in-command requirement had been "announced," or

that Stone & Webster employees would have been officially aware of it for any

reason.  Even so, the court does not find evidence of gender-based discrimination.

While "[t]he use of unannounced policies, interpreted according to subjective

-29-

criteria," *can* support a plaintiff's claim of pretext, "an informal and unwritten policy subject to differing interpretations" will not "*in and of* [*itself*] violate Title VII." *Conner v. Fort Gordon Bus Co.,* 761 F.2d 1495, 1500-01 (11th Cir. 1985) (citing *Allison v. Western Union Telegraph Co.,* 680 F.2d 1318, 1322 (11th Cir. 1982)) (emphasis supplied).   Absent any additional evidence to call into question the legitimacy of the second-in-command requirement, its subjective nature is insufficient, standing alone, to support a claim of pretext.

Plaintiff also argues that pretext is demonstrated by defendant's shifting, inconsistent reasons for denying her incentive payments.  The Eleventh Circuit has held that "an employer's failure to articulate clearly and *consistently* the reason" for an adverse employment decision "*may* serve as evidence of pretext."  *Hurlbert v. St. Mary's Health Care System, Inc.,* 439 F.3d 1286, 1298 (11th Cir. 2006) (citing *Wascura v. City of South Miami,* 257 F.3d 1238, 1245-46 (11th Cir. 2001)) (emphasis supplied).

Here, plaintiff first asserts that defendant made statements in this case that are inconsistent with statements it made to the EEOC during the administrative proceedings.  In a response to a request for information by the EEOC, Stone & Webster argued that plaintiff was a Senior Administrator, not a Site Administrator or Technical Manager.  Stone & Webster informed the EEOC that it

established an incentive compensation plan which is designed to reward "key personnel" for achieving certain performance objectives that have been identified by TVA. Under the plan, certain job positions have been designated as "key" positions which are eligible for the salary-based award. McGee has never held any of the *job positions* designated under the bonus program, therefore making her ineligible to receive bonuses by virtue of her *job position*, not her gender.[83]

Stone & Webster also stated to the EEOC that plaintiff's efforts to compare herself to Site Administrators at other sites were "misleading because the *duties* of those positions are substantially different from the *duties* performed by" plaintiff.[84]

Plaintiff argues that, in this lawsuit, defendant has shifted positions and "conceded [she] was in a position that was bonus-eligible but tried to justify denying her a bonus."[85] The court does not agree with this assessment. First, defendant has not conceded that plaintiff was in a "bonus-eligible" position. In its brief, Stone & Webster states that plaintiff was promoted to "Senior Administrator,"[86] and argues that "her *position* did not generate enough revenue to have an impact on profitability."[87] Further, defendant's efforts in this lawsuit "to justify denying

---

[83]Defendant's evidentiary submission, Tab M, Exhibit 42, at 4 (emphasis supplied).

[84]*Id.* at 3 (emphasis supplied).

[85]Doc. no. 36 (plaintiff's brief), at 26.

[86]Doc. no. 29 (defendant's initial brief), Statement of Facts, at ¶¶ 21, 27.

[87]*Id.* at 26 (emphasis supplied). *See also id.* at 22 (Defendant acknowledges that the job plaintiff filled after Ruhl's departure "was significantly altered from its original function."); doc. no. 38 (defendant's reply brief), at 7 n.4 ("McGee testified that she has never been referred to as 'Project Technical' nor does she have the experience and education as other individuals who have held the 'Project Technical' position.").

[plaintiff] a bonus" are not inconsistent with its past arguments to the EEOC. Defendant argues to this court — just as it did to the EEOC — that plaintiff was not a "key" employee whose job sufficiently affected Stone & Webster's profitability to justify awarding her a bonus.[88]  Defendant also maintains in this lawsuit — just as it did before the EEOC — that plaintiff's job duties differ significantly from those of male Site Administrators at other sites.[89]  Thus, defendant's statements to the EEOC are not so inconsistent with its statements to this court as to call into question the legitimacy of its proffered non-discriminatory reasons.

Plaintiff also asserts that defendant has offered inconsistent justifications *during this litigation* for failing to award her an incentive payment. Kent Ryan stated that plaintiff did not receive an incentive award in 2003 because she was new to her position.  In 2004, he said that plaintiff did not receive an incentive payment because she did not contribute sufficiently to Stone & Webster's profitability.  Don Olson stated that plaintiff did not receive an incentive award in 2005 because she was not "key personnel," and she could not serve as second-in-command to the Site Manager. These are not shifting, inconsistent justifications for the same incentive payment decision; instead, they are separate justifications for separate decisions.  Moreover,

---

[88]*See, e.g.,* doc. no. 38 (defendant's reply brief), at 6; doc. no. 29 (defendant's initial brief), at 24.

[89]Doc. no. 29 (defendant's initial brief), at 24-25; doc. no. 38 (defendant's reply brief), 7-8.

defendant's proffered justifications are not inconsistent with each other, or with the incentive plan documents.  The common thread running through all these proffered justifications is that plaintiff was not a "key" employee who performed the type of job duties that Stone & Webster expected before the employee could be considered for an incentive award.  The proffered justifications also are all consistent with the incentive plan document itself, which states that incentives will be awarded when a "key" employee significantly affects the project's profitability.[90]

Finally, plaintiff argues pretext based upon defendant's allegedly "more favorable treatment of similarly-situated men and other evidence."[91]  There is not sufficient evidence in the record for the court to conclude that any of plaintiff's allegations reflect a discriminatory motive and call into question defendant's proffered legitimate, non-discriminatory reasons.

Plaintiff first contends that, in 2003, when she did not receive an incentive payment because she was new to her position, two men who were new to their

---

[90]Plaintiff also argues that the justifications proffered by Ryan and Olson should be discredited because they are subjective and unsupported by any documentation.  This argument is without merit, as the Eleventh Circuit has held that an employment decision based on subjective criteria is not sufficient, standing alone, to prove pretext.  *See Denney v. City of Albany,* 247 F.3d 1172, 1185 (11th Cir. 2001) ("Absent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII or other federal employment discrimination statutes.") (citations omitted).  *See also Conner v. Fort Gordon Bus Co.,* 761 F.2d 1495, 1500-01 (11th Cir. 1985).

[91]Doc. no. 36 (plaintiff's brief), at 28.

positions *did* receive incentive payments.  It is true that a male employee, David Ford, received an incentive award in 2004, despite the fact that it was his first year working for Stone & Webster.  Nonetheless, Kent Ryan testified that Ford had held a position for another company that was similar to the one he occupied at Stone & Webster.[92]  Marcus Gann received incentive payments in 2003 and 2004, but the record does not clearly reflect that he was new to his position in either of those years.  In fact, Ryan testified that Gann had been serving in his role since the summer of 2002.[93]

Plaintiff also asserts that, while she was denied an incentive payment in 2004 because her position allegedly did not sufficiently affect profitability, a male employee (Ron Boehm) whose position had a limited effect on profitability received incentive payments in 2004 and 2005.  Ron Boehm's incentive payments ceased in 2006.  During that year, Curt Lefferts, who then served as Regional Director, began to implement changes to the incentive plan.  Specifically, because profit levels had been reduced, Lefferts eliminated certain job positions that had the least impact upon profitability from consideration under the plan.[94]  He determined that Joe Kappes' worksite had too many individuals up for consideration under the plan, and asked

---

[92]Ryan Deposition, at 143.

[93]Ryan Deposition, 250-52; *see also* Second Deposition of Kent Ryan, at 1-14.

[94]Lefferts Deposition, at 19-20 ("The profit had been reduced and the pool had been reduced, and positions that were involved were excessive.").

Kappes to recommend for elimination a position that did not significantly impact profitability. Kappes recommended Boehm, his Facilities Manager.[95] Thus, it is clear that Boehm's elimination from the incentive plan was a result of the changes implemented throughout the Browns Ferry, Watts Bar, and Sequoyah sites by Lefferts. The changes implemented in 2006 do not undermine the credibility of the reasons offered for decisions made in 2003 through 2005, especially considering that Boehm was eliminated from the incentive plan for the same reason plaintiff never received an incentive award in the first place — *i.e.,* because his position did not sufficiently affect the project's profitability.

Plaintiff also states that Norm Ruhl received an incentive payment in an unspecified year when he performed the same cost analyst functions as plaintiff. The differences between plaintiff's and Norm Ruhl's job duties have been well established. Therefore, awarding Norm Ruhl, but not plaintiff, an incentive payment, does not constitute evidence of pretext.

Finally, plaintiff states that, in 2005, Don Olson authorized an incentive payment for a female site administrator, Libby Bell, who was not capable of serving as second-in-command. The fact that a *female* Site Administrator who was not capable of serving as second-in-command received an incentive in 2005 does not

---

[95]Lefferts Deposition, at 21-22. *See also* Kappes Deposition, at 13-14.

support a claim of discrimination *against another female.*[96]

## IV.  CONCLUSION AND ORDER

Plaintiff has failed to carry her burden of proving that any of defendant's proffered legitimate, non-discriminatory reasons are a mere pretext for gender-based discrimination.   Accordingly, defendant's motion for summary judgment is GRANTED.  All remaining claims against defendant are DISMISSED with prejudice. Costs are taxed to plaintiff.  The clerk is directed to close this file.

DONE this 29th day of February, 2008.

_____

United States District Judge

---

[96]Plaintiff reminds the court that the favorable treatment Don Olson gave Libby Bell "is no defense to his disparate treatment of McGee." Doc. no. 36 (plaintiff's brief), at 29 n.2.  The Eleventh Circuit held in *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181 (11th Cir. 1994), that "Title VII does not 'give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group.'" *Id.* at 1186 (quoting *Connecticut v. Teal,* 457 U.S. 440, 455 (1982)). Thus, plaintiff's argument technically is correct, and it would also be consequential, *if* defendant actually were offering Libby Bell's receipt of an incentive award as a defense to disparate treatment.  It is not.  Instead, *plaintiff* points to Bell's receipt of an incentive award to show that the legitimate, non-discriminatory reasons defendant *did* offer were a mere pretext for gender discrimination.  In *Nix,* the Eleventh Circuit was careful to note that it is "not irrelevant" when another employee in the same protected class as the plaintiff receives favorable treatment.  *Nix,* 738 F.2d at 1186 n.1.  Indeed, such a fact can be used — as this court has used it here — as evidence to show that the employer's articulated reason for the employment decision is not a pretext for unlawful discrimination.  *Id.*